The United States Court of Appeals for the Ninth Circuit is now in session. Good afternoon and welcome to the Ninth Circuit. The case for argument this morning, or this afternoon, is Bolin v. Davis. Mr. Bacon, you may proceed. Thank you, Your Honor. May it please the Court, I will reserve five minutes for rebuttal. I am Robert Bacon, here on behalf of the appellant Paul Bolin. The State failed Mr. Bolin twice and failed him in the same way at trial and on State habeas. Gave him appointed counsel who simply failed to prepare his case and did not give adequate resources to the substitute counsel to allow them to cure the prejudice. The Attorney General wants this Court to hold the State's failures against Mr. Bolin. The District Court, instead of testing what the State Court did for reasonableness, mistakenly assumed that the State Court had made factual findings adverse to Mr. Bolin. By using the wrong standard, the District Court reached the wrong result. I ask the Court to remand for full factual development of the penalty ineffectiveness claim as a whole. I emphasize as a whole, both because that is factually required by Browning and by White, also because it is, I should say, legally required by those decisions and factually required by what happened in this case. The deficient performance went on for a whole year, most of it before Mr. Cater took over, most of it before the certified issue about a continuance. No continuance that would be reasonable while a jury was waiting would also be long enough for Mr. Cater to do what he and Mr. Soria had failed to do over the course of 11 months. So the Court has to look at the deficient performance as a whole. Frankly, Mr. Cater was so far behind before he started that he had no chance to catch up. Counsel were appointed in January of 1990, 11 months before that. They knew up front that this was a penalty phase case, case that was likely to go to penalty phase, but did almost no penalty investigation and none that eventually proved to be of any value to Mr. Bolin. They didn't get military records, they didn't get employment records, they didn't get prison records. An investigator who, at least part of the time, was intoxicated did brief interviews with witnesses, witnesses who had significant information to give, but he didn't get it from them. Mr. Cater didn't know all of this when he took over. That unawareness is itself deficient performance. He discovered it almost immediately, but they'd already picked a jury. Can I ask you, with regard to your argument, you touched upon this, the request to expand the COA to cover what's termed as the wholesale failure to investigate, but is there a deficiency that you identify beyond the current claims in, I guess, will be to claim W-2 and claim C-2, which is the failure to seek a further continuance, the alleged inadequate mitigation investigation, and also the renewal of the change of venue motion. Are there other issues beyond that? The deficient investigation covers claim W in its entirety. It is Section 3 of my opening and my reply briefs. That's what I wanted to clarify, that the claim W, the wholesale failure to investigate, the failure to seek a continuance in claim W-2 is wholly subsumed within claim W. Is that right? Yes, it is. Yes, it is. Mr. Cater, on the 14th of December, told that he's expected to go to penalty phase on the 7th of January, immediately discovers that the extent of the deficiency, they'd already made strategic decisions, they'd picked a jury, they presented a guilt phase, the December holidays were coming up, he quickly learned they were dependent on out-of-state witnesses. During those five weeks, he learned things that this court and the Supreme Court call red flags. He learned from Mr. Boland's sister that Mr. Boland's childhood had been, in her words, a living hell. He learned that Mr. Boland had been a throwaway child who had attempted to subsist on the streets of Chicago from as young as nine years old, knew that Mr. Boland had been in the Navy, that he'd served in Vietnam, that he exhibits symptoms of post-traumatic stress after he left the service, learned that he was a substance abuser. All these things have potential mitigating value, minimally advocate counsel understands that, also understands that before any tactical decisions can be made, they require record gathering, they require in-depth investigation, they require expert consultation, things that could not be done in those five weeks over the holidays. Let me ask you about the claim as it does relate to the continuance, because as you've well laid out, the Ruby, the second investigator, actually discovered quite a bit about the childhood and the details and the stares and the beating and that sort of thing, although Cater chose apparently not to present that information to the jury, but at least with respect to the background that comes primarily from the family, the lawyer knew that going into the penalty phase, correct? He knew this basic outline of that small part of his life. He knew very little else. He didn't know enough to make informed strategic decisions about what to present and what not to present at the penalty phase. The jury had heard two weeks about Mr. Bowen, the murderer, and all he had to offer was two hours of Mr. Bowen, the family man, and he didn't have anything to present that would allow the jury to tie those things together. As Your Honor points out, the evidence the jury heard about his childhood fits on one or two pages of the transcript. They learned the fact of his Navy service and absolutely nothing more about it. I guess I'm having trouble understanding why you couldn't present really what is irrefutable coming from the family. Mr. Bowen's not going to testify. The prosecutor's not going to be able to do anything with what Rosemary might have said, although she wasn't called, but Frances also told Ruby really these very significant facts, it seems to me. The question is, based on those significant facts, were those the red flag on the brain damage that you think should have been explored through an expert? They are one part of it. Things that Mr. Kater did not know, the things that the jury did not know, were about being under enemy attack in wartime, about occupational exposure to toxins, both military and civilian, about no testing for brain damage, no diagnosis, no link between the history and the crime. Your Honor mentions about family evidence being irrefutable. The prosecutor did her best to discredit Mr. Bowen's daughter's testimony, whereas a significant adequate investigation would have provided significant corroboration, significant explanation that was not there for the jury. Prosecutor exploited all of these things in her penalty phase argument. What the jury didn't know, because what Mr. Kater didn't know, it was powerful, it was what the court calls classic mitigation. Watched his father beat and try to kill his mother with a knife. The abuse left him with scars on his head when he was 17 years old, the same scars were visible when he was 43 years old. I think we're quite familiar with the record, and you have nicely laid that out in your brief. Let me ask you on a legal point. You suggest that we would be benchmarking this penalty phase investigation as a factual determination rather than as a matter of law under the unreasonable application of established law? Is it a D1 or a D2 analysis in your view on this penalty phase continuance and other issues? The penalty phase as a whole, it actually can be reviewed either way. Perhaps the court more often has viewed it as under D1 as an unreasonable application of Strickland, and it certainly is that. What support do you have that we should look at it under D1 rather than, as you suggest, we have traditionally looked at this under a D2 analysis? I don't know. BMOR is mostly D1. IRP, which is also a summary denial, looks at it under D2. You come out the same place either way. It may fit better under D1 here given the summary nature of the state court's order in which it was not making the adverse factual findings to Mr. Boland that the district court purported to find but actually were not made under the procedure adopted by the state court and followed by the state court. I suggest four ways of looking at the contrast between what the jury heard and what adequate investigation would have produced for the jury, four contrasts that demonstrate the unreasonableness of an application of Strickland against Mr. Boland here. One is that what was available essentially was a movie, and what the jury saw were a handful of snapshots with nothing connecting them. The jury heard good character evidence about a man they had just convicted of murder, as opposed to what would have been available with adequate investigation, which is an explanation of why these homicides happened. There's a difference between a checklist and a story. Yes, he was in the Navy, but you don't just check that off the list. Yes, his childhood, check that off the list. That's not the way mitigation works, the court has recognized. Do you have one thing that I think you've argued persuasively is the need for an expert in these kinds of situations, and that's certainly supported in the Benmore v. Chappelle case, but then we have other cases that go the other way that say, well, you don't necessarily need an expert. In your view, what is the baseline for determining whether this failure to engage someone like a neuropsychological expert for the penalty phase was required under the law versus whether it wasn't necessarily an unreasonable application to say that the procedures were sufficient? I'll give a two-part answer. One is the factual red flags, such as military service in Vietnam and the clear symptoms of post-traumatic stress. The other is that simply due to the inadequacy of the factual investigation, Mr. Keeter never reached the point of having adequate information to make an informed tactical decision that an expert was not called for. What about the report they had from Dr. Markman? I understand that you disagree with his conclusions, but Keeter had that, and so maybe you could explain why you think he was not entitled to rely on that. The essential problem is not so much Dr. Markman's conclusions, but everything that went into them. Initially, Mr. Keeter tells us that he did not rely on Dr. Markman to make tactical decisions, so it's not a question of whether he was reasonable to do so, because he did not. More importantly, Dr. Markman was consulted for purposes related to the guilt phase, to competency and to sanity. The court has held in Summerlin and in Bean that it is ineffective assistance for counsel to use an evaluation made for those purposes to make tactical decisions related to the penalty phase. The most important thing about Dr. Markman is that his opinion was essentially worthless for any purpose, for reasons that were the fault of counsel and not the fault of the doctor. He was given only police probation and court records. He had no other life history except what little bit Mr. Boland was willing to tell him. He relied on the self-report without any kind of testing, without exploring what was discovered later that Mr. Boland was confabulating, and what little history he gave was not trustworthy. Dr. Markman did no testing. I think perhaps the closest analogy for Dr. Markman is the expert in the Hendricks case, who was so thoroughly impeached on cross-examination because of the limited field of information on which he relied, that this court said it was like having no expert at all. So, Dr. Markman need not concern the court. Mr. Cater properly recognized that Dr. Markman's report was of no value, but Cater did not have the time to pursue appropriate expert consultation, and beyond that, the background information that would be necessary for any expert to reach useful conclusions. I want to talk a little bit about Dr. Cason. I just want to ask you again about, you know, going back to Dr. Markman. It seemed to me that it was totally sensible not to call him because he didn't add anything to the equation for mitigation in any event, even though he was obviously done for, you know, the guilt phase, but the fact that there was antisocial behavior and enormous consequences from drinking, he didn't provide any opinion, did he, that you would consider mitigating? No, he didn't. I don't fault Mr. Cater for a minute for concluding that Dr. Markman was useless. Okay, I just wanted to confirm that. Thank you. Absolutely. Absolutely. So, your argument is that given the short continuance, the five-plus weeks, that's not enough time to basically consult with additional psychiatric experts who might have provided an opinion that's different from Dr. Markman. Is that the gist of your argument? That's part of it. It's not enough time to do the background investigation necessary to provide the information to a mental health expert so that they can give the kind of evaluation that is appropriate for mitigation. So, it's not just a matter of working into a doctor's schedule, because if the investigation has not been done, if the records have not been gathered, that second doctor will be in no better position than Dr. Markman was to be helpful to counsel in assessing the case. Well, help me understand something, because a lot of this evidence that you argue should have been explored further and presented in a mitigation case, to me, seems like it's a double-edged sword. So, with regard to the military service, for example, if you delve too deeply into that, then, you know, there's a risk that his problems while he was in the Navy would come out, such as a disciplinary record while he was in the military. And with regard to the mental health evidence, it's a double-edged sword as well, because if you present some of this evidence that was gathered during the post-conviction relief stage, then there's a potential for them to open the door to an expert like Dr. Markman, who says there's just no major mental health issue that in any way has a sufficient nexus to the crime. So why isn't it reasonable, given what counsel knew, to say it's not a good strategy, because then instead of just focusing on his positive attributes, like he was a good father to his daughters, he's a good provider, he did something productive with his life in serving in the military, and then have that be the extent of it rather than risk opening the door to a presentation or counter by the prosecution. Several things in response to Your Honor's questions. With respect to his military record, the Supreme Court, in the Porter case, was not deterred by the adverse information in Mr. Porter's military record, which included multiple instances of going AWOL, which is not reflected here, but the Supreme Court granted relief there. Going into the Navy, he couldn't leave his childhood trauma behind, he couldn't leave his brain damage behind. Those followed him into the service. By presenting two hours of good guy, Mr. Kater certainly opened the door to a closing argument by the prosecutor that belittled it all. The rebuttal that Ms. Newcomb holds out in this case is entirely hypothetical. This is not a case like Belmonte's, not a case like Atwood, not a case like Cummings, in which there is known adverse rebuttal that counsel is obligated to stay away from, and certainly has a duty to stay away from. The history, the brain damage, it leads directly to the charged crime, it leads directly to the priors in aggravation. He's a positive, generous, protective single parent, despite his disabilities. He takes in the neighbor kids, because no one took him in when he was a kid. He couldn't protect his mom, he couldn't protect himself when he was a kid. Now he can protect his daughters and protect his turf, but sadly, because of the brain damage, he protects in inappropriate ways. He protects his daughters from dangers that really are there, like Mr. Ross and Mr. Spencer, who testified in aggravation. He also protects his daughters from things that aren't there, from dangers that exist only in his own mind. He's dissociating, he's exhibiting numerous symptoms of post-traumatic stress. He's walking around in camouflaged clothing as if they're about to be under attack. He's protecting in ways that are hypervigilant, inflexible, impulsive, and too quickly resorting to violence. It fits with his brain damage, it fits with his history, it fits sadly with what happened up there on the mountain when two young men were killed. I will conclude my answer to your Honor's question by contrasting an expert like Dr. Matthews or Dr. Kosanoff, who are thoroughly prepared with the background information, counsel would have nothing to fear from a rebuttal expert like Dr. Markman, that certainly is entitled that no reason, even with a counsel who, unlike Mr. Cater, had adequate information to make this kind of strategic decisions, would not be deterred from investigation, presentation of expert testimony of the quality of what was available from Dr. Kosanoff and Dr. Matthews. Did you want to reserve the remaining time, your choice? Indeed I do, thank you, Your Honor. You're welcome. We'll now hear from Ronald Davis, represented by Ms. Newcomb. May it please the Court, good afternoon, Your Honors. My name is Rochelle Newcomb. You had a lot of questions of my opposing counsel regarding the penalty phase, so I would like to focus there. In this case, however, the district court properly denied all of Boland's allegations that his counsel were prejudicially ineffective, and in particular, as this court seems interested in, in failing to seek a third continuance prior to the start of the penalty phase. Regarding that request for a third continuance, the state court reasonably could have determined that counsel chose a penalty phase strategy of focusing on Boland's positive attributes and adjustment to prison life after conducting a reasonable investigation, instead of presenting cumulative, contradictory, unavailable, speculative, or almost certainly damaging evidence that would have weakened his case to a Kern County jury for a life sentence. Boland has also not shown that no reasonable jurist could agree with the state court's determination that Boland had failed to produce substantial or compelling evidence on state habeas to support a claim that counsel had been ineffective in choosing his penalty phase strategy. Even had Boland presented this evidence to the jury of the additional witnesses and documents that he put forth on state habeas, and that he gathered in the ten years following his judgment, Boland falls short of proving that an alternative penalty phase strategy would have convinced the jury to choose life imprisonment. What the focus needs to be on in this case is what defense counsel did do, not what he did not do. The important matter here is that counsel did investigate and presented evidence regarding his traumatic childhood, that he had served in the Navy, and in the Vietnam War specifically. Mr. Kater also was able to indicate that he rejected his abandonment as a child by feeding and sheltering and protecting his own children, who had been abandoned by their own mothers and stepchildren, and that he created a sense of family and protection and fed and sheltered also other drifters that were in the community. In addition, he used those same skills to create a feeling of family with his Chicago relatives. These factors showing his positive attributes and ways that he had contributed to society and his family and his community, in spite of the traumatic childhood that he had, where he had no such protection himself, led to a belief, hopefully for the Kern County jury, that he would be safe as an inmate in prison. In fact, he had someone testify on his behalf that he was a model inmate who had adjusted well to prison life, and that's exactly the sort of evidence that would help the jury determine that he could be safe in prison. All of this, that begs one of the, I think, kind of the elephant in the room question, and that relates to the brain damage, because the jury did not hear about that and did not even hear the predicate testimony by either sister on that point, and that seems to me to be a pivotal issue as to whether you then need expert testimony or whether it would have been reasonable, as the state court impliedly said, that even without that additional expert, that there was no ineffective assistance of counsel. So if you would address the brain damage issue, I would appreciate it. Yes, Your Honor. With regard to the brain damage, even Boland's own expert that he offered many years after trial on state habeas never concluded that Boland definitively had brain damage at the time of the crime, and he has also not indicated there's any proof, or he didn't even opine in his declaration that there were facts supporting the scar on his head having occurred when he was a child or having occurred when he was in the military. He simply noted that there was a scar on his head and that that could have led to brain damage, and he was able to speculate or he was able to indicate that Boland may currently have brain damage, which was 10 years after the judgment again, but not that he necessarily had it before that, and those were mere speculative claims. More importantly, however, Mr. Cater was around Boland at the time of the trial in the preparation phase. He was aware of his ability to be a participant in the proceedings. He carefully set forth, sorry, Boland carefully set forth his disagreements with Counsel Soria during the guilt phase. He set those forth on the record. They were coherent. In addition, Cater had indicated that Boland was working with him, and at that same time when they had the discussion about Mr. Soria's performance at the guilt phase, he said that he was working well with Mr. Cater, had provided him information. They were able to get additional information, and in addition to that, he also was able to act appropriately, I guess you would say if you'd just killed two people, in coming up with a reasonable alibi, at least that was his attempt to do that, in fleeing, in staying in hiding for three months, and immediately after the murders was able to help his family in such a way in Chicago that they appreciated his contributions and had nothing to say about his temper or his inability to think coherently and act coherently. In fact, they wanted the relationship with him, and there was no negative testimony regarding that, nor was any submitted on state habeas, indicating that those... On your point on the brain damage, didn't Dr. Kasnoff say that there was some kind of a neurological dysfunction, i.e. brain damage? That was ten years after the judgment. There was no indication at the time of the crimes or the trial that he had brain damage. There was nothing supporting such a claim. In fact, Dr. Markman, when he spoke to Olin, his findings were such that... His findings were such that the defendant did not suffer from any diagnosis or did not have any mental illness diagnosis, that he was coherent, he was able to track what was following, he was able to give reasonable explanations, and the fact that he was confabulating or making up evidence, which was something that experts ten years later tend to throw out, was speculation on their part. But in addition, it was also not unreasonable for a person who had committed two murders to make up the circumstances of the crime and try to turn them in his favor. As I understand Mr. Bacon's argument, and he's acknowledged that Dr. Markman's report was in no way helpful in a mitigation case, but his point, if I understand it correctly, is that the investigation was inadequate because had counsel, Mr. Cater, paid attention to the red flags and gotten an expert like Dr. Kasnoff or Dr. Matthews, who could testify, maybe not compellingly, but it was worth the risk to testify that there is some connection to frontal lobe damage, which I think is Dr. Kasnoff's testimony, it was worth the risk, even if it opens the door to the prosecution presenting a counter-expert. Because in light of the nature of the crime, having, as he put it, two hours of good guy testimony isn't going to cut it. So there's no downside, really, to consulting with experts like Dr. Kasnoff and Dr. Matthews, even if it means that the prosecution can counter that with Dr. Markman-like testimony. How do you respond to that? Well, counsel relied upon an expert that was consulted by the defense, and counsel relied upon that forensic psychologist's expertise in determining that further investigation into that area was not necessary. And so he was entitled to reasonably rely upon that. There was an expert consulted. It simply wasn't the expert that Cater would have wanted. That expert was chosen by the defense, and Cater was aware of his opinions. I believe Mr. Bacon had stated that Cater dismissed the report. Well, he had it, and he reviewed it, and he was aware of what was in it, and it was reasonable for counsel to rely upon a qualified expert in making decisions about strategy, number one. Number two, in Kern County, Cater indicated his years of experience in Kern County. Mr. Soria testified at the evidentiary hearing, and it was also in the record, that a large percentage, half of Kern County, was pro-death. And at that time, in 1990, when he was making these choices, he had to consider that jury, and he had to consider what that jury would accept or would agree with. And back in 1990, there was less, I dare to say, less understanding of brain damage or other defenses, especially in Kern County. In fact, they had specifically eschewed the idea of doing a mental defense during the guilt phase, not only because it wasn't viable, but also because the mental health defense kind of goes to some degree with the brain damage in the sense that there was no evidence of those, at the time, that would put him on notice, Mr. Cater, on notice of offering that evidence. And with regard to Your Honor's comment about the fact that what would be the harm, the harm is he's got to balance a strategy. He doesn't get to throw everything at the wall and have the jury believe it. He has to instead pick what the jury might find most believable. And in a case like this, he was going with what he knew about Kern County juries, and they're bent towards death. He was also going with the information that he had, which is that Olin was acting coherently with his family and other information at the time. He was going with the information that he had consulted a qualified forensic psychologist, and he was also going with the information that providing this conflicting strategy would confuse the jury. If he was arguing on the one hand that Mr. Bolin would adjust well to prison life, and had done so despite a period of time when he also allegedly had brain damage, but again, that's all speculative. But even assuming it to be true, he was a model inmate at that time, and since that time he was able to shelter and feed and clothe and help all the family members. So what the jury would see is that he was a good guy, but he has brain damage or mental health that showed explosive features, as Mr. Bacon pointed out, explosive, unpredictable, irrational responses like what happens in a crime in this case. And so Tater had to factor in what happened in the guilt phase, what the jury knew, how Bolin had been described by his recent family, and I think that was important. Even though Mr. Bolin downplayed the fact of his recent cooperation with his family, it shows that he knew how, despite his horrible childhood, he knew how to try to create a sense of family, and he did it. He did it inappropriately, which is why there were murders here, and prior crimes where he acted inappropriately in defense of others. But that does not mean that Mr. Tater chose something unreasonable. We need to focus on what he did, and what he did present was a reasonable strategy of focusing on Bolin's positive attributes, his ability to adjust in prison, and the fact that he did not warrant a death sentence in that case. Unfortunately, the strategy failed, but that doesn't mean that the strategy was bad. There were multiple strategies, and a strategy which presented, well, he might have a mental illness, he might have brain damage, but he's really good at adjusting to prison, and he's really good with his family despite those things, is conflicting. And a jury in that county, as the record reflects, a county with high feelings, sorry, high inclinations toward guilt and the death penalty, he had to factor in what strategy would be best. You know, I don't see those stories as conflicting. Maybe I view it a little differently than you, but the fact that his family testifies he's a good guy, he's taking care of them, he did well in a prison setting as a model prisoner, according to one of the corrections officers, that's not inconsistent with having brain damage and then having these explosive episodes. So I don't see those as mutually inconsistent. And I think counsel's argument, as I understand it, is that this brain damage issue is so significant, both in terms of it does have at least potentially a factual predicate in the childhood, but it's so significant that there should have been an expert brought in on that point. So he didn't make a judgment based on an assessment of the brain damage. If he made an assessment, he made it on apparently a deficient expert who actually didn't even talk or know about that. So maybe you can explain how you bridge those, because I don't see the stories as either confusing or inconsistent. They're simply part of the mosaic of his life. Yes, Your Honor. In this case, he did reasonable investigation that he had an expert look into Mr. Boland's history. He told the expert those things. With regard to that, he then reasonably relied upon that reasonable investigation to determine that he had to pick a strategy that his county would be willing to his jury, his particular jury who he knew very well through voir dire, the questionnaires and the questioning, that they would find something reasonable for a life sentence. If they were to show that he had brain damage, even if it was in addition to what he had shown already, without rebuttal from the prosecutor, it could still indicate that he was a mixed bag in terms of his ability to adjust to life in prison, that he continued to do his protection activities for the drifters in the neighborhood and his children and his stepchildren and his Chicago family. I'm sorry to interrupt you, counsel. I just want to clarify your answer, because it seems to me like your answer essentially is going towards your argument that given what counsel knew, he basically made a reasonable strategic choice, especially when you look at deference that we have to apply over that decision. The state court could reasonably conclude his performance was not deficient because in light of what he had, that was a reasonable tactical choice. Counsel is making, I think, a separate but related argument in that you can't make a reasonable strategic choice if you don't have the right information. And there were red flags that would have indicated a need to basically investigate further, more deeply into the background childhood trauma, and then the need to basically secure a more favorable expert to testify about the brain damage. So as to that separate question, I take it that your response is that based on what he had from Dr. Markman and the other information available, there were no red flags? Is that your argument in response to that separate question? Yes. There were no red flags in the sense that Cater was not aware of these red flags. Cater was working with Bolin on a daily basis. Cater knew the facts of the crime. Cater had talked to the witnesses. Nowhere in there was there indication from the witnesses, the family members, his time working with Mr. Bolin, et cetera, in his declaration in state court, which is the only additional evidence this court would consider since there wasn't an evidentiary hearing in federal court on this claim. So under AEDPA, considering even that evidence, Cater did not present in his declaration that he had any inkling that there was a sign of brain damage. He indicated how Bolin had cooperated with him. He indicated what his strategy were. He also indicated that there were times that Bolin didn't cooperate, but he didn't indicate any sign of he's not thinking coherently. In fact, that was part of the competency evaluation was how coherent he was thinking. Granted, Dr. Mortman's report had to do with competency, but it was reasonable to rely on a forensic psychologist to discuss with Bolin these matters. Some of what we're discussing here, I apologize for interrupting. Some of what we're discussing, probably most of it seems to go to performance. The district court had a sort of lengthy discussion on the second half of this, which is prejudice, which is we have the Markman, excuse me, we have the Matthews report. We have the additional information that Mr. Bolin came forward with in state habeas. And the argument, I think, that's made is some of this seems possibly speculative in terms of the brain damage and how neurotoxin exposure could have affected his actions, including on the day in question. And when you compare that to the aggravating circumstances, at least under the AEDPA standard of review, there's a question as to where is there prejudice? How would this have been different? Yes, Your Honor. That's an additional point. So I understand now that you're leading me to the second prong of Strickland, which is going to be considered doubly deferential under the AEDPA standard of review. And with regard to that, Bolin has not shown, even if he had presented this evidence, he has not shown a reasonable probability that the jury would have sentenced Bolin to life simply because he used that different strategy. That is the standard he must meet. He must show that the jury would have had a different outcome, not just that they could have, not just that they would have considered brain damage, but that they would have concluded differently if they had heard all of that evidence. And what we have in that evidence is two doctor's reports that they submitted 10 years later. And that's an important point because they weren't evaluating Bolin at the time of the crime or at the time of the matters. But the important part was that there was no prejudice in this case because he could not show a reasonable probability of a different result. These additional witnesses, some were unavailable to Mr. Cater. For example, Rosemary really didn't want to testify on Bolin's behalf, so Mr. Cater reasonably chose to have Francis testify to cover most of the same material. In addition, there was evidence that wasn't very convincing because it was contrary to other evidence that was presented. For example, on the aggravation incident, he complains about how the prosecutor was able to impeach Mary's testimony regarding the Spencer incident and the Ross incident. Well, in reality, she never spoke to the police at any of those times during those incidents, so she never provided any testimony then. But yet, now, many years later, she claims in a declaration that she would have said this, that, and the other thing. The state Supreme Court was entitled to balance that evidence in light of the trial record that it had before it. So it doesn't just consider the state habeas evidence. The state Supreme Court considers all the evidence in light of the trial court record, and the trial court record and that additional declaration were conflicting, as well as the testimony of these witnesses. Granted, they could have brought in an expert to say he was brain damaged, but that alone does not show a reasonable probability of a life sentence. Brain damage could go either way to a jury, a jury that's concerned about him being able to be safe in prison with other inmates, a jury that's concerned with his ability to escape. They were also presented with evidence about how he had friends on the outside that he would use to take down Jerry Halfacre because of misdeeds. And so they were also aware that he had thoughts of basically taking care of other people, even from the inside. And so that evidence was before the state court and had to be considered in light of, well, now we put forth evidence that he's brain damaged and consider it in that light, and maybe because of his brain damage, he would reach out to people he knew out in the community to take care of other people he didn't like. He did have connections. That was clear. And so he had to balance all the evidence that he knew the prosecutor was putting on with the other evidence. And when you look at all of that, there is no reasonable probability that he would have gotten a life sentence simply had he added in some brain damage, some information about his possible brain damage, because the jury could look at that either way. They could look at it as mitigating in the sense that he had trouble making good decisions, or they could look at it as aggravating in that he continues to have trouble making poor decisions, and he acts out of aggressiveness. And so the problem would be that the jury would hear that and a death-leaning jury, which is what Kern County in general has, but with this jury had made reasonable assurances that they would not consider the pretrial publicity and several of the jurors, as Zoria represented at the evidentiary hearing in district court, several of them thought of the death penalty as a last resort or would really find it difficult to vote for death. And so he didn't want to give them any reasons to do so. He wanted to give them reasons to support a life sentence, and that was clearly a reasonable strategy here. Even had he put on this evidence, even if the evidence that he put in state habeas was before the jury, there's just no reasonable probability that he would have received life from that jury. Yeah, I mean you seem to be arguing this sort of focusing on the double-edged nature of some of this evidence, and that may be reasonable. Is there also an argument just about the persuasiveness of the evidence on this phase? Yes, that's what I was attempting to say earlier when I talked about how if he, about picking strategies, that he can't just have a strategy of giving them every piece of evidence that he's ever found or that was presented to the state court on habeas. He has to look at all of that and make a reasonable decision, and once he has done that, that decision is virtually unchallengeable. He must be aware of whether or not he would be able to get a result that was different, and when you balance all of these strategies, you're able to see that the relevant timing here is what was presented at the penalty phase. In 1990, what did he present? He presented a coherent and persuasive argument to save Mr. Boland's life. Unfortunately, it wasn't compelling enough in light of Mr. Boland's inability to also listen to the pleas of his victims before he shot them. In short, the warden submits that the district court ruling was proper in denying the writ, and it should be upheld. Council, in both the venue motion and in the penalty phase strategy, made reasonable strategic choices based on information that they had. Mr. Soria made reasonable choices, Soria and Cater, actually, during the selection of the jury and the decision not to renew the venue motion based upon juror answers, what they knew about the community, and the fact that they felt good with the jury that they had, that that jury seemed to be, first of all, all of them gave credible assurances, and in addition, all of them had been questioned about life and death, and he had retained several jurors that were pro-life jurors, as he called them. In addition, Mr. Cater, as this court has focused on, chose a penalty strategy. He chose a reasonable one based on his investigation, not just the investigation of the five weeks that occurred after the guilt phase, but the investigation of which he was aware prior to that, the family history of which he was aware, that even Mr. Binns had presented, and state court knew of that, on state habeas, because the declarations from the family members were that Mr. Binns had spoken to them, and there was also information that Mr. Binns had relayed a lot of his investigation verbally, and that information was turned over. In this instance, Your Honors, he simply has failed to produce substantial or compelling evidence such that it would undercut the chosen penalty phase strategy that he used, in order to show that Mr. Bowen would have gotten a sentence of life, that there was a reasonable probability that he would have gotten a sentence of life, if he had presented some of these additional pieces of evidence that he presented on state habeas. Thank you. Thank you. Ms. Reagan, you have some time for rebuttal. Thank you, Your Honor. Probably the most fundamental problem with Ms. Newcomb's argument is that Mr. Keeter was never in a position to make the kind of choices that she attributes to him, because he simply didn't know enough about Mr. Bowen's background, and he didn't rely on Dr. Markman. He tells us in his declaration, in his testimony in the district court, that he did not rely on Dr. Markman, so it doesn't matter whether he could have, should have, or not. She also confuses frontal lobe damage with incompetency or psychosis. Mr. Keeter was able to communicate with him. The officers, the admirals in the Navy who gave Mr. Bowen glowing recommendations, promoted him up to E6, did not find him psychotic or incompetent, even though his brain damage was there all of that time. Dr. Matthews and Dr. Kosinoff's opinions are based on events up to the time of trial, even though they were not consulted for some years later. However, the sources that Dr. Kosinoff found most likely as the causes of the brain damage, the head trauma as a child, the exposure to combat, the substance abuse, these were things that had occurred prior to the trial. Mr. Bacon, I do have a question maybe you can clarify, and that relates to Keeter's view as to what he should look at and what he had and what he considered. And that didn't come out until federal habeas, is that right, in terms of the affidavit? And are we permitted to consider that in looking at the state court's determination? My primary argument is that unreasonableness has been demonstrated on the state court record, resulting in a remand for full de novo evaluation, including the taking of additional evidence. So does that mean the answer is no, we don't consider that at this stage? At that step. Should you disagree with everything I have said, I have also pointed out that initial state habeas counsel abandoned him in the same way Mr. Soria did, and perhaps more so, and that if the court otherwise was to affirm, a remand under Martinez would be appropriate for that second level of ineffectiveness. I hope the court doesn't need to go there, but that is available if it is. And finally, well, the proclivities of Kern County juries are indeed a relevant consideration for counsel fully informed after an adequate investigation to decide what to present to the jury. Strickland speaks of a national standard in terms of investigation, and that there is no reduced standard for Kern County, and Kern County can't create one by denying resources or denying continuances. Under the standard of Strickland and Wiggins and Williams, this investigation fell far short of a minimum standard. The state court was unreasonable to conclude otherwise. Judgment should be reversed. The case should be remanded for full factual development of the penalty phase claim in its entirety. Thank you, Your Honors. Thank you. I do want to thank both counsel for your argument, for being so well prepared, so being familiar with the record, which I know is extensive in this case, and also want to thank you for your briefing as well. The case just argued of Boland v. Davis is submitted, and we're adjourned for the afternoon. This court for this session stands adjourned.
judges: McKeown, Nguyen, Bress